CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

March 24, 2026

LAURA A. AUSTIN, CLERK
BY: s/J.Vasquez
DEPUTY CLERK

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION**

| | | |
|---|---|---|
| SHAWN TOLBERT, | ) | |
|     Plaintiff, | ) | **Case No. 7:23-cv-00534** |
| | ) | |
| v. | ) | |
| | ) | **By: Michael F. Urbanski** |
| NURSE DEBORAH QUESENBERRY, | ) | **Senior United States District Judge** |
| et al., | ) | |
|     Defendants. | ) | |

## MEMORANDUM OPINION

Shawn Tolbert, an inmate proceeding pro se, filed this civil action under 42 U.S.C. § 1983 against six individuals employed at the New River Valley Regional Jail (NRVRJ): Deborah Quesenberry, Lisa Ferguson, Samantha Hunt, Brenda Moran, James Keen, and Donald Cornett.[1] Tolbert claims that the defendants acted with deliberate indifference to his medical needs after he arrived at the jail. The case is presently before the court on the defendants' motion for summary judgment. ECF No. 51. Tolbert has responded to the motion, ECF Nos. 60 and 61, and the motion is ripe for review. For the following reasons, the motion for summary judgment is **GRANTED**.

### I.    Background

#### A.    Tolbert's Verified Pleadings and Attached Exhibits

The events giving rise to this action occurred at the NRVRJ from August 31, 2022, through September 8, 2022. See Am. Compl., ECF No. 10 at 4–8; Compl. Attach., ECF No.

---

[1] Although the docket also lists John Doe as a defendant, the amended complaint does not include any allegations against a separate unknown defendant. Instead, Cornett is identified in the amended complaint as "(John Doe) Officer-Sgt. Cornett"—presumably because, unlike the other defendants, Tolbert did not know Cornett's first name. Am. Compl., ECF No. 10 at 1; see also Compl., ECF No. 1 at 1 (listing "Officer Sgt. Cornett (John Doe)" as a defendant).

1-1 at 1–12. Tolbert was transported to the jail from LewisGale Hospital Pulaski ("LewisGale"), where he was treated in the emergency room (ER) following his arrest.[2]

Tolbert alleges that he was discharged from the ER "with a care plan that recommend[ed] that [he] have a one to one sitter at all times due to the serious nature of the condition [he] was in." ECF No. 10 at 4. This allegation is based on language in a psychiatric consultation note entered by Dr. Adetokunbo Ladenika, a LewisGale psychiatrist who examined Tolbert several hours before an ER physician determined that Tolbert's condition had stabilized and that he did not require further treatment.[3] At the time of the psychiatric consultation, Tolbert was "unable to state [whether he was] suicidal or homicidal." ECF No. 1-1 at 8. Consequently, Dr. Ladenika recommended that a "one to one sitter . . . be with [Tolbert] at all times." Id.

Tolbert alleges that after he arrived at the jail on August 31, 2022, Licensed Practical Nurse (LPN) Samantha Hunt chose to leave him lying on the floor of a cell "instead of giving [him] the medical help [he] needed," even though Hunt knew that he had been released from LewisGale. ECF No. 10 at 4. The following day, Tolbert saw LPN Brenda Moran who reported that Tolbert refused to cooperate for an assessment. Id. at 5. Tolbert alleges that he was uncooperative "due to the fact [he] was injured." Id.

---

[2] Tolbert filed a separate lawsuit against multiple doctors and nurses at LewisGale. See Tolbert v. Kletzing, No. 7:23-cv-00530 (W.D. Va.) (Urbanski, J.). The court may take judicial notice of the record in that case. See Colonial Penn Ins. Co. v. Coil, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records") (internal quotation marks omitted).

[3] Dr. Ladenika's entire consultation note was included in the medical records submitted as exhibits in Tolbert v. Kletzing. See No. 7:23-cv-00530, ECF No. 62-2 at 37–45.

On September 2, 2022, Tolbert saw Mental Health Counselor James Keen and Sgt. Donald Cornett. He alleges that both defendants elected to leave him lying in the cell "because [he] wasn't able to respon[d]," rather than "getting help for [him] when [he] was injured." Id.

Tolbert alleges that he was "just starting to be able to function properly" on September 5, 2022. Id. at 6. He alleges that he subsequently sent a request form to the medical department asking why he was not being "treated properly" and that he received a response from LPN Deborah Quesenberry indicating that he was receiving appropriate treatment. Id.; see also ECF No. 1-1 at 6 (correspondence between Tolbert and Quesenberry). Tolbert asserts that Quesenberry failed to provide necessary medical attention despite being aware of the discharge instructions from LewisGale. ECF No. 10 at 6.

Tolbert alleges that he sent another request to the medical department that was answered by Health Services Administrator Lisa Ferguson. Id. at 6–7. He asserts that Ferguson knew about his condition and the hospital's discharge instructions, but nonetheless "left [him] injured in a cell," rather than treating him in the medical department or sending him "back to the ER at LewisGale for the serious condition that [he] was in." Id. at 7; see also ECF No. 1-1 at 4–5 (correspondence between Tolbert and Ferguson).

NRVRJ chart notes attached to Tolbert's original complaint indicate that he was released from the ER with a diagnosis of conversion disorder. ECF No. 1-1 at 11. Similarly, discharge notes from LewisGale refer to a conversion reaction. ECF No. 1-1 at 10. The discharge notes attached to Tolbert's complaint describe his condition as "stable" and include the following additional instructions:

> Return to the emergency department if you develop worsening pain, fever/chills, cannot eat/drink, pass out. Follow up with your doctor as needed for recheck.
>
> You do need mental health follow up.

Id.

Tolbert claims that the defendants violated his rights under the Eighth and Fourteenth Amendments by providing inadequate medical treatment and acting with deliberate indifference to his medical needs. ECF No. 10 at 2. He seeks to recover monetary damages against the defendants in their individual capacities. Id. at 3.

**B.      Defendants' Evidence**

In support of their motion for summary judgment, the defendants submitted declarations, medical records, and other exhibits. See ECF No. 52 at 23–111. The court will refer to the medical records and other exhibits using the page numbers assigned by the court's CM/ECF system.

The defendants' evidence indicates that Tolbert arrived at the NRVRJ between 9:30 and 10:00 p.m. on August 31, 2022, after being discharged from the ER at LewisGale. Corbin Decl. ¶ 2. Immediately following Tolbert's arrival, Officer A. Romain attempted to complete an initial booking observation report. According to an incident report prepared by Romain, Tolbert "refused to answer most of his booking questions," including "medical questions." ECF No. 52 at 66. Tolbert did, however, "shake his head no when asked if he was suicidal." Id. "Due to Tolbert's current charges and the extent of his arrest, it was decided to place him on observation in Booking cell A3." Id.

4

NRVRJ observation records indicate that Tolbert remained on observation from 10:05 p.m. on August 31, 2022, until 10:28 a.m. on September 6, 2022. Cornett Decl. ¶ 5.  During that time, officers generally observed Tolbert three times per hour. ECF No. 52 at 56–65.  On each occasion, the officers made a note of what Tolbert was doing at that particular time. The notes indicate that Tolbert was found to be lying on the floor on several occasions before 12:43 a.m. on September 1, 2022, when he was given a mat. ECF No. 52 at 65. Tolbert was then observed lying on the mat on multiple occasions. Id. at 56–65. On other occasions, Tolbert was observed speaking to officers or nurses, eating meals, or standing in the cell or at the door. Id.

LPN Hunt examined Tolbert on August 31, 2022, shortly after he was placed on observation. Hunt Decl. ¶ 2. Hunt checked his vital signs and found them to be within normal limits. Id. Hunt noted that Tolbert responded "no" when asked if he took any medications or had any health problems. ECF No. 52 at 33. Tolbert reported that he was hungry and wanted something to eat, and arrangements were made for Tolbert to have a sandwich. Id. Hunt maintains that Tolbert "did not exhibit any signs of medical distress" and that "there were no indications that he needed immediate medical care." Hunt Decl. ¶ 2.

During Hunt's visit to his cell, Tolbert claimed that he needed a one-to-one sitter. Id. ¶ 3. However, the discharge instructions provided by LewisGale did not include such recommendation. Id. The only records that the NRVRJ received from LewisGale consisted of an eight-page discharge summary faxed to the medical department. Corbin Decl. ¶ 5; see also ECF No. 52 at 34–42. The discharge summary indicates that Tolbert was diagnosed with "conversion disorder (conversion reaction)," which occurs "when stress or conflict triggers

physical symptoms," such as an inability to move parts of the body; a loss of speech, sight, or hearing; difficulty urinating or swallowing; or tremors or non-epileptic seizures. ECF No. 59 at 39. The discharge summary indicates that conversion disorder "may in some ways look like a neurological disorder, but is not," and that the "main treatment for conversion disorder is counseling." Id.

On September 1, 2022, LPN Moran attempted to conduct an intake assessment. Moran Decl. ¶ 2. Moran's declaration and a chart note indicate that the assessment could not be performed because Tolbert "was uncooperative and on '2 Officer' status, which means there must be two officers present in order for NRVRJ staff to enter his cell." Id.; see also ECF No. 52 at 33 (note indicating "unable to screen due to being 2 officer, and being uncooperative"). "Inmates are placed on 2 Officer status when they have shown the potential to harm themselves or others." Moran Decl. ¶ 2. Although Moran was not told why Tolbert was placed on "2 Officer" status, she subsequently learned that he had been tased during his arrest, thereby "implying he was combative with law enforcement." Id. ¶ 3. Moran did not have two officers to enter the cell with her at the time she attempted to conduct the intake assessment. Moran Decl. ¶ 2.

On September 2, 2022, NRVRJ mental health counselor Keen went to meet with Tolbert since he had been placed on observation. Keen Decl. ¶ 2. Sgt. Cornett accompanied Keen during the visit. Cornett Decl. ¶ 7. Keen attempted to perform a risk assessment, which is designed to determine whether an inmate can be safely released to general population. Keen Decl. ¶ 2. Keen's declaration indicates that Tolbert acknowledged his presence but refused to participate in the risk assessment. Id. Nonetheless, according to Keen, "Tolbert did not

present as needing any immediate mental health or other medical treatment." Id. Out of an abundance of caution, however, Keen recommended to Cornett that Tolbert remain on observation until Keen could successfully complete a risk assessment. Id. Cornett followed that recommendation. Cornett Decl. ¶ 7.

Nurse Moran successfully conducted Tolbert's intake assessment on September 5, 2022. Moran Decl. ¶ 4; ECF No. 52 at 42–48. The intake assessment consists of questions posed by a nurse to the inmate regarding the inmate's physical and mental health. Moran Decl. ¶ 4. Moran's declaration includes the following summary of the results of the assessment:

> Mr. Tolbert's vitals were normal, and Mr. Tolbert did not provide any responses indicating that he was in distress or needed immediate medical attention. Mr. Tolbert's mental health screening yielded normal results. He denied having any cognitive impairment, and presented as alert and oriented, with an appropriate affect and mood. His speech was appropriate. He reported no suicidal ideations and reported that he was not thinking of hurting himself or others. He reported being able to control his behaviors. When asked about his medical problems, Mr. Tolbert said that he had ringing in his ears, headache that comes and goes, pain in his elbows, and his knees were popping. Mr. Tolbert denied having any chronic conditions or seizure activity. He appeared neat, clean, his behavior was appropriate, he had no impaired movement, and he was composed through the Intake Assessment. He reported taking no medications. In short, Mr. Tolbert appeared to be in good physical and mental health. However, based on Mr. Tolbert's stated medical issues (ringing of ears, headache, elbow pain, and popping knees), I put a task in Medical's electronic system for him to be examined by the provider.

Id.; see also ECF No. 52 at 42–48.

In addition to performing the intake assessment, Moran observed Tolbert during rounds while he was on observation. Moran Decl. ¶ 6. Moran maintains that she never saw anything indicating that Tolbert was in distress or needed medical attention. Id.

7

Sgt. Cornett was responsible for completing an electronic booking observation report for Tolbert. Cornett Decl. ¶ 4. Because Tolbert seemed confused while being asked questions, Cornett referred him to the NRVRJ mental health group via email, as documented in the report. Id.; see also ECF No. 52 at 24. The report also indicates that Tolbert seemed "drowsy" during the assessment but "did respond to questions." ECF No. 52 at 23.

Keen met with Tolbert again on September 6, 2022, at which time he was able to conduct a risk assessment. Keen Decl. ¶ 3; ECF No. 52 at 32. Keen's declaration includes the following summary of the visit, which is also reflected in a chart note:

> [Tolbert] presented with a good mood and normal affect. He was alert and oriented and denied any suicidal or homicidal ideations. When I asked Mr. Tolbert about his current medical issues, he said he had dizziness and headache, which were being addressed by medical staff at the NRVRJ. Based on Mr. Tolbert's presentation, I recommended to NRVRJ security staff (Lt. Hall) that Mr. Tolbert be released from Observation and referred to Classification for placement in general population.

Keen Decl. ¶ 3; ECF No. 52 at 32. The chart note indicates that Tolbert "expressed frustrations over his treatment" and expressed the belief that staff "had not taken his state of delirium seriously." ECF No. 52 at 32. Keen noted that he "provided support" during the risk assessment and advised Tolbert that his medical issues would be discussed with the medical department. Id.

Keen does not recall whether he had reviewed Tolbert's discharge summary from LewisGale prior to his visits with Tolbert. Keen Decl. ¶ 6. Although Keen has since learned that Tolbert had been diagnosed with conversion disorder, Keen asserts that Tolbert "did not demonstrate any observable signs of conversion disorder during [their] interactions" and that

8

he "would have proceeded in the same manner" had he known of the diagnosis from LewisGale. Keen Decl. ¶ 6.

Tolbert was released from observation, as recommended by Keen, on September 6, 2022, at 10:28 a.m. ECF No. 52 at 56. That same day, Tolbert submitted an inmate request form alleging that he had been "brought in disoriented with possible concussion or [seizure]" and that he was "never seeing medical." ECF No. 52 at 30. RN Lisa Ferguson, who served as the NRVRJ Health Services Administrator, answered the request. Ferguson Decl. ¶ 1. Since Ferguson was not personally involved in examining or treating Tolbert, she reviewed Tolbert's medical records from the medical department and LewisGale. Id. ¶¶ 2, 7. That same day, she provided the following response:

> You were released from the hospital which means you are well enough to leave. You were booked in at 9:30 p.m. and seen by the nurse at 11:00 p.m. Your vital signs were normal, you requested food, [and] the nurse got you a sandwich. The next days you refused to participate and [were] uncooperative. You were not disoriented when the nurse saw you initially. The hospital did NOT diagnose you with a concussion. The medical staff treated you appropriately.

ECF No. 52 at 30.

Nurse Practitioner Crystal Davis examined Tolbert the following day. Id. at 52. During the examination, Tolbert reported having been tased several times. Id. He complained of a headache, ringing in his ears, elbow pain, and knee popping. Id. Davis noted that Tolbert was in no acute distress (NAD), that he had a normal gait and full range of motion, and that his taser wounds were "healing nicely" with "no redness, drainage, or swelling." Id. She prescribed prednisone and ibuprofen to address his physical complaints. Id.

9

On September 8, 2022, Tolbert submitted another request form alleging that he was "being denied an informal complaint by medical" and that medical was falsely claiming to have seen him the day that he arrived at the jail. ECF No. 52 at 28. LPN Quesenberry provided the following response the next day:

> You [were] seen by nurse on 8/31 [for] vital checks and was asked about meds. Seen by provider on 9/7. Also seen at ER before coming to jail.

Id. Quesenberry did not personally examine Tolbert while he was incarcerated at the NRVRJ. Quesenberry Decl. ¶ 4. Prior to responding to Tolbert's request, Quesenberry reviewed his jail medical records and the records from LewisGale. Id. ¶ 3. She "had no knowledge of his medical conditions other than what was provided in his medical records." Id.

## II.    Standard of Review

The defendants have moved for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. The court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248–49 (1986)).

When ruling on a motion for summary judgment, the court must "view the facts and all justifiable inferences arising therefrom in the light most favorable to the nonmoving party." Id. at 312. The court may not "weigh the evidence or make credibility determinations." Jacobs

10

v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015). "To survive summary judgment, 'there must be evidence on which the jury could reasonably find for the nonmovant.'" Lee v. Town of Seaboard, 863 F.3d 323, 327 (4th Cir. 2017) (brackets omitted) (quoting Anderson, 477 U.S. at 252).

"As a general rule, when one party files a motion for summary judgment, the nonmovant cannot merely rely on matters pleaded in the complaint, but must, by factual affidavit or the like, respond to the motion." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991). "However, it is well-established that a verified complaint is the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." Goodman v. Diggs, 986 F.3d 493, 498 (4th Cir. 2021) (internal quotation marks omitted); see Fed. R. Civ. P. 56(c)(4) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."). Nonetheless, conclusory allegations in a verified complaint are insufficient to survive summary judgment. See Dash v. Mayweather, 731 F.3d 303, 311 (4th Cir. 2013) ("Although the court must draw all justifiable inferences in favor of the nonmoving party, the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence.").

### III.    Discussion

Tolbert claims that the defendants violated his federal constitutional rights by acting with deliberate indifference to his medical needs after he arrived at the NRVRJ. Because the record reflects that Tolbert was a pretrial detainee at the time of the events in question, his

claims of deliberate indifference are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Eighth Amendment, which applies to convicted prisoners. Mays v. Sprinkle, 992 F.3d 295, 300 (4th Cir. 2021).

To survive summary judgment on a Fourteenth Amendment claim of deliberate indifference, a pretrial detainee must present sufficient evidence to establish: (1) that the detainee "had a medical condition or injury that posed a substantial risk of serious harm"; (2) that "the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed"; (3) that "the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm"; and (4) that "as a result, the detainee was harmed." Short v. Hartman, 87 F.4th 593, 611 (4th Cir. 2023). For the following reasons, the court concludes that no reasonable jury could find from the evidence that any of the defendants acted with deliberate indifference.

### A.    LPN Samantha Hunt

It is undisputed that Hunt's only interaction with Tolbert occurred on August 31, 2022,  shortly after he arrived at the NRVRJ. The record indicates that Tolbert's vital signs were normal at that time; that he denied having any health problems or taking any medications and asked for something to eat; and that the ER discharge instructions that Hunt reviewed made no mention of the need for a one-on-one sitter, as Tolbert claimed. On this record, no reasonable jury could find that Hunt knew or should have known that any action or inaction on her part posed an unjustifiably high risk of harm. While Tolbert argues in his unsworn response to the defendants' motion that he does "not remember any interaction with

Samantha Hunt [due] to the condition [he] was in," ECF No. 60 at 4, a lack of recollection, standing alone, "does not create an issue of fact that will defeat a motion for summary judgment." Lee v. City of Richmond, 100 F. Supp. 3d 514, 523 (E.D. Va. 2015) (internal quotation marks omitted); see also Wellons, Inc. v. Lexington Ins. Co., 566 F. App'x 813, 819 n.4 (11th Cir. 2014) ("On summary judgment, Towne's inability to independently recall the conversation does not create a genuine issue of fact."); Bradshaw v. New Jersey, No. 3:18-cv-14089, 2026 WL 310110, at *11, 14 (D.N.J. Feb. 5, 2026) (noting in a case involving claims of deliberate indifference that a plaintiff's inability to recall a discussion with a doctor did not suffice to create a material issue of fact).

**B.    LPN Brenda Moran**

Tolbert claims that Moran acted with deliberate indifference by not providing any medical treatment on September 1, 2022, when she unsuccessfully attempted to perform an intake assessment. Although Tolbert asserts that he was unable to cooperate because he was "injured," ECF No. 10, he does not identify any visible injury or outward signs of distress from which a reasonable jury could find that Moran knew or should have known that he was suffering from a serious medical condition that required immediate treatment. See, e.g., Beatrice v. Johnson, No. 24-7009, 2026 WL 624616, at *2 (4th Cir. Mar. 4, 2026) (concluding in a case filed by the estate of a deceased pretrial detainee that "the proffered evidence of [the detainee's] different look and general lethargic appearance" provided "only mere speculation that [the detainee] exhibited signs of a serious medical need during this time, which cannot sustain a reasonable inference that [the defendant] should have known [the detainee] was suffering from a serious medical condition").

The record reflects that when Moran successfully performed the intake assessment four days later, Tolbert's vital signs were normal, his mental health screen yielded normal results, and he exhibited appropriate behavior. Nonetheless, based on his physical complaints during the assessment, including ear ringing, headache, elbow pain, and knee popping, Moran arranged for him to be examined by a nurse practitioner, who saw him two days later and prescribed prednisone and ibuprofen. On this record, no reasonable jury could find that Moran engaged in the sort of "knowing[]" or "reckless" conduct required to prevail on a claim of deliberate indifference. Short, 87 F.4th at 611.

### C.    Mental Health Counselor James Keen

Tolbert seeks to hold Keen liable for not "getting help" for him on September 2, 2022, when Keen unsuccessfully attempted to perform a risk assessment to determine whether Tolbert could be released to general population. ECF No. 10 at 5. Although Tolbert alleges that he was unable to respond to Keen's questions because he was "injured," id., he once again fails to identify any particular medical condition or injury of which Keen should have been aware. Keen's declaration indicates that it is not uncommon for detainees to be uncooperative after being arrested and that Tolbert "did not demonstrate any signs of a mental health crisis or a need for immediate mental health treatment." Keen Decl. ¶ 2. Nonetheless, Keen recommended that Tolbert remain on observation out of an abundance of caution, and he met with Tolbert again four days later, at which time Tolbert was alert and oriented and presented with a good mood and normal affect. On this record, no reasonable jury could find that Keen's actions met the high bar of deliberate indifference.

14

**D.     Sgt. Cornett**

Tolbert claims that Sgt. Cornett failed to address his medical needs when Cornett accompanied Keen to Tolbert's cell on September 2, 2022.  It is undisputed that Cornett's only involvement in that visit was to provide security for Keen and that Cornett has no formal medical or mental health training. Cornett Decl. ¶ 7. Courts have recognized that nonmedical correctional personnel can rely on the expertise of healthcare professionals and "will generally be justified in believing that [a] prisoner is in capable hands." Arnett v. Webster, 658 F.3d 742, 766 (7th Cir. 2011). Although nonmedical personnel "cannot be permitted to simply ignore an inmate's plight of which they're aware," Estate of Miller v. Marberry, 847 F.3d 425, 431 (7th Cir. 2017) (internal quotation marks and brackets omitted), there is no evidence from which a reasonable jury could find that Cornett knew or should have known that Tolbert was suffering from a serious medical condition when he accompanied Keen to Tolbert's cell or that Cornett's action or inaction posed an unjustifiably high risk of harm.

In response to the defendants' motion for summary judgment, Tolbert emphasizes that the booking observation report that Cornett completed on a subsequent day indicates that Tolbert "seemed confused" and "drows[y]" during the booking assessment. ECF No. 52 at 23. Even assuming that these symptoms could be signs of a serious condition, no reasonable jury could find that Cornett "intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed." Short, 87 F.4th at 611. Instead, based on Tolbert's apparent confusion, Cornett "referred [Tolbert] to the NRVRJ mental health group via email as documented" in the booking report. Cornett Decl. ¶ 4; see also ECF No.

52 at 24 (documenting "email sent to mental health"). Thus, Tolbert has failed to create a genuine dispute as to whether Cornett acted with deliberate indifference.

### E.   Heath Services Administrator Lisa Ferguson

It is undisputed that Ferguson did not personally examine or treat Tolbert during the period at issue. Her sole involvement in the events giving rise to this action consisted of responding to Tolbert's September 6, 2025, request form in which he complained of "never seeing medical," despite being "brought in disoriented with possible concussion or [seizure]." ECF No. 52 at 30. The record indicates that Ferguson reviewed Tolbert's records from the medical department and LewisGale and determined that the claims in his request form were incorrect. As noted above, Tolbert was released from the LewisGale ER in stable condition with the sole diagnosis of conversion disorder. Tolbert was not diagnosed with a concussion or seizure. Additionally, at the time of the request, Tolbert had been assessed by Nurse Hunt and Nurse Moran, and Moran had entered a request for Tolbert to be examined by a healthcare provider at the jail. Consequently, no reasonable jury could find that Ferguson acted with deliberate indifference in responding to Tolbert's request.[4]

---

[4] To the extent Tolbert seeks to hold Ferguson liable under § 1983 based on her supervisory position as the NRVRJ Health Services Administrator, "[i]t is well settled that there can be no supervisory liability when there is no underlying violation of the Constitution." Phillips v. Bailey, 337 F. Supp. 2d 804, 807 (W.D. Va. 2004) (collecting cases). Additionally, the record is devoid of evidence sufficient to satisfy the test for supervisory liability set forth by the United States Court of Appeals for the Fourth Circuit. See Johnson v. Robinette, 105 F.4th 99, 123 (4th Cir. 2024) ("To establish supervisory liability, the inmate must prove: '(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that. posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.'") (quoting Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994)).

**F.      LPN Deborah Quesenberry**

The court reaches the same decision with respect to Quesenberry. Like Ferguson, Quesenberry did not personally examine or treat Tolbert. Instead, her sole involvement was responding to Tolbert's September 8, 2022, request form in which he complained about not being seen by medical personnel. ECF No. 52 at 28. In response, Quesenberry noted that Tolbert was "seen at ER before coming to jail," that a nurse checked his vital signs after he arrived at the NRVRJ on August 31, 2022, and that Tolbert was "seen by provider"— Nurse Practitioner Crystal Davis—the previous day. Id. As noted above, the nurse practitioner prescribed prednisone and ibuprofen to address Tolbert's physical complaints. On this record, no reasonable jury could find that Quesenberry acted with deliberate indifference to a serious medical need.

## IV.      Conclusion

For the reasons stated, the court concludes that there is no genuine dispute as to any material fact and that the defendants are entitled to judgment as a matter of law. Accordingly, the defendants' motion for summary judgment, ECF No. 51, is **GRANTED**. An appropriate order will be entered.

Entered: March 23, 2026

Michael F. Urbanski
U.S. District Judge
2026.03.23
17:08:59 -04'00'

Michael F. Urbanski
Senior United States District Judge

17